**EXHIBIT A**

MC7GsmiC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JOSHUA SMITH, et al.,

4                   Plaintiffs,

5              v.                          22 Civ. 4052 (LJL)

6    PERGOLA 36 LLC,
                                           Remote Conference
7
                   Defendant.
8    ------------------------------x
9                                          New York, N.Y.
                                           December 7, 2022
10                                         12:00 p.m.

11   Before:

12                      HON. LEWIS J. LIMAN,

13                                         District Judge

14                         APPEARANCES

15   CRUMILLER P.C.
          Attorneys for Plaintiffs
16   BY:  CHLOE LIEDERMAN
          HILARY J. ORZICK
17
     PECHMAN LAW GROUP
18        Attorneys for Defendant
     BY:  VIVIANA A. MORALES
19        GALEN C. BAYNES

20

21

22

23

24

25
```

MC7GsmiC

| | |
|---|---|
| 1 | (The Court and all parties present remotely) |
| 2 | THE COURT: Who do I have on for plaintiff? |
| 3 | MS. LIEDERMAN: Good morning, this is Chloe Liederman |
| 4 | for the plaintiff, and my colleague, Hillary Orzick is here |
| 5 | with me as well. |
| 6 | THE COURT: And for defendant. |
| 7 | MS. MORALES: Good afternoon, Judge. This is Vivana |
| 8 | Morales, and also on the line is my colleague Galen Baynes also |
| 9 | for defendant. |
| 10 | THE COURT: So I have the competing motions to compel |
| 11 | discovery at Docket No. 36. There's a plaintiffs' motion and |
| 12 | there's a defendant's motion. What I'm prepared to do is walk |
| 13 | through each of the motions point by point, starting with the |
| 14 | plaintiffs' motion and either give you rulings or reserve |
| 15 | judgment if I need to. |
| 16 | Is that an acceptable means of proceeding from |
| 17 | plaintiffs' perspective? |
| 18 | MS. LIEDERMAN: Yes, your Honor. |
| 19 | THE COURT: And from Ms. Morales, from your |
| 20 | perspective? |
| 21 | MS. MORALES: Yes, your Honor. Thank you. |
| 22 | THE COURT: What I propose to do, what I will do is |
| 23 | I'm going to walk through each of these now on plaintiffs' |
| 24 | motion and try to understand from plaintiff why there is a |
| 25 | dispute. |

MC7GsmiC

1          The first item has to do with discovery related to any

2     other incidents of alleged discrimination.

3          Ms. Liederman, the defendants said they produced the

4     one written complaint of racial discrimination and that, to the

5     extent that there are complaints on social media or public

6     websites and that those are what you are seeking, those are

7     equally available.  What's wrong with the defendant's response?

8          MS. LIEDERMAN:  Well, we're not concerned so much

9     about what's publicly available online as the fact that the

10    search for responsive documents, that Pergola is in possession

11    of has not been guided by any ESI protocol or even an agreement

12    about search terms.

13          So as far as we are aware and what we were told during

14    the meet-and-confer is that defense counsel has essentially

15    delegated to their clients to conduct their own search guided

16    by their own search parameters of their own choosing.  So this

17    is part of the reason why we need to enter an ESI protocol

18    agreement so that we can make sure that -- we have no idea what

19    search terms have been used, if any.  For all we know,

20    defendants have just relied upon their memories to identify and

21    produce responsive documents regarding other complaints of

22    discrimination.

23          And we also need documents related to any nonwritten

24    complaints of discrimination.  For example, insofar as there

25    were incidents that people complained verbally of

MC7GsmiC

1   discrimination at Pergola, and then there were communications

2   about that in writing by the party's staff, those would need to

3   be produced as well.

4            THE COURT:  Do you have basis to believe that there

5   were other complaints about discrimination, other than the one

6   that was produced to you and that --

7            MS. LIEDERMAN:  Yes, your Honor.  And the basis is

8   that dozens of people -- well over 40 people -- have complained

9   online about experiencing race discrimination in Pergola.  And

10  within some of those complaints, the reviewer also said they

11  complained about race discrimination at the scene.

12           THE COURT:  Let me hear from Ms. Morales.

13           MS. MORALES:  Thank you, your Honor.

14           Defense counsel, we have actually taken custody of the

15  devices by privileged owners, and we conducted our own search,

16  a thorough search where we reviewed the text messages between

17  Pergola employees and the owners looking for situations of

18  discrimination, either if they were directly provided in

19  writing or, as plaintiffs' counsel states, that they were oral

20  complaints that were then passed on.  And those documents were

21  produced to counsel.

22           To specify the method of our search, we actually did

23  use search terms, and the search terms that you would expect to

24  look for complaints of discrimination.  Some of the search

25  terms were the ones that were provided with plaintiffs' ESI

MC7GsmiC

1    protocol draft.  So we can state that all those complaints of

2    discrimination, orally or written to Pergola, were produced.

3         In that respect, there were text messages produced to

4    plaintiffs' counsel.  For example, security personnel telling

5    the owners somebody was complaining, we had an incident here,

6    and he's describing the incident.  So any incidents of

7    discrimination were already produced to plaintiffs' counsel.

8         THE COURT:  Ms. Morales, is there a reason why you

9    would not share the search terms and try to reach an agreement

10   with plaintiffs?  I'm not asking you now whether you have a

11   legal basis, but as a practical matter, in order to avoid you

12   having to do the search again.

13        MS. MORALES:  Regarding the search terms and the ESI

14   protocol itself, essentially from the defendant's point of

15   view, we know the types of documents that we're looking for, we

16   understand the devices, the way they are organized in

17   defendant's phones.  So we have provided and done this thorough

18   search, some of which using the search terms provided by

19   plaintiffs and some of them using search terms that we created

20   on our own thinking of what it is that we would be looking for

21   to try to yield the responsive documents.  So from our point of

22   view, we are meeting the ESI protocol, because we have already

23   provided the responsive documents and done this thorough

24   search.  And as far as I hear, there isn't an objection as to

25   our method of search now that it has been thoroughly explained

MC7GsmiC

| 1 | to plaintiff.  So at the end of the day, we just don't think

2  it's necessary now that we have done this whole --

3       THE COURT:  But you actually still haven't given me a

4  particular basis why you wouldn't share that information.  What

5  are your concerns about?

6       MS. MORALES:  Relating to which search terms we used

7  for the complaints of discrimination, your Honor?

8       THE COURT:  Yes.  And let me elaborate a little bit.

9       One reason to share search terms is that instances

10  come up where it becomes clear that you have not produced every

11  document that would be responsive.  That's inherent to the

12  process.  It happens in every case that there will be some

13  document that is responsive to some request that is not

14  produced.  That's the reason why the rules require there to be

15  reasonable searches, language a party addresses -- I'm now

16  speaking to both counsel -- that they have a conversation in

17  advance about search methodology.  And there's an agreement,

18  here's the following things we're going to search for, and

19  that's going to be it, full stop.  And my question to you is

20  why you wouldn't have done that in this case.  What's the

21  concern?

22       MS. MORALES:  In terms of providing them with the

23  search terms, we have already used, if that's what plaintiffs

24  are looking for to ascertain whether or not our search was

25  complete, then we can provide those search terms.  But in the

MC7GsmiC

| 1 | absence of, as your Honor was saying, some disagreement as to a |
| 2 | specific example of discrimination that wasn't produced or a |
| 3 | particular document, then going forward and entering into |
| 4 | protocol with more and more search terms I just don't think |
| 5 | will yield more documents and also does become burdensome at a |
| 6 | certain point when we are getting just so many other.  Now that |
| 7 | they have received our production, if there is something else |
| 8 | they are looking for that hasn't been identified by search |
| 9 | terms, we can meet-and-confer on what additional search terms |
| 10 | they feel are required.  But after we have already provided our |
| 11 | search, we think that we have already satisfied that response |
| 12 | and that there aren't any other documents that exist. |
| 13 | THE COURT:  So what I am hearing you say -- and let me |
| 14 | make sure I'm hearing it correctly -- is that you are willing |
| 15 | to provide to the plaintiff your search terms and, I take it, |
| 16 | also, the locations against which you ran those search terms; |
| 17 | is that correct? |
| 18 | A.  The locations of the devices that we used, yes. |
| 19 | THE COURT:  In other words, if it's the owner's |
| 20 | devices, you are going to say the owners' devices.  If it's the |
| 21 | other employees, you would mention the other employees.  But |
| 22 | you will tell them where it is that you searched and what it is |
| 23 | that you used as the search terms; correct? |
| 24 | MS. MORALES:  Yes, your Honor. |
| 25 | THE COURT:  Let me turn back to you, Ms. Liederman. |

MC7GsmiC

1    At this stage, why isn't that sufficient?  What more can I ask

2    the defendants to do?

3          MS. ORZICK:  Your Honor, this is Hilary Orzick.  I'm

4    the primary person for ESI.  We would also ask that defendant

5    state the custodians and the time frames whereby which they are

6    searching.  For instance, on our preliminary negotiations on

7    ESI protocol before they stopped responding, defendants took

8    the position that the search had to start on January 21st,

9    2022, which is the day of the incident, through the present.

10   And we take great issue with that.  This is a proposed class

11   action ranging for four years, pursuant to Section 1981.  And

12   so it's important that we also understand the time frame that

13   they are searching, because we believe that the four-year time

14   frame is appropriate in this case.

15         THE COURT:  Without ruling on the time frame,

16   Ms. Morales, will you give them the time frame?

17         MS. MORALES:  Well, Judge, we used the time frame that

18   they had suggested and it's clear that the documents that we

19   produced to them -- some of them are prior to the date of the

20   incident, so that should have been clear.  But yes, we

21   searched --

22         THE COURT:  Then that resolves that issue.  I don't

23   need to issue an order because the defendant has represented

24   that they're going to provide the search terms, the custodians

25   and the time frame with respect to discovery related to other

MC7GsmiC

1    incidents of alleged racial discrimination.

2        The next one is communications between Pergola

3    employees the race and/or skin color of any Pergola patron.

4    Let me ask, Ms. Morales, is it correct with respect to this one

5    that you will provide the used search terms and add a time

6    frame?

7        MS. MORALES:  Yes.  We used the time frame and used

8    search terms to provide documents, yes.

9        THE COURT:  And I take it you are willing to provide

10   that to the plaintiff?

11       MS. MORALES:  Yes.

12       THE COURT:  Any issue for me to resolve, Ms. Orzick?

13       MS. ORZICK:  Not at this time.  We anticipate that

14   there may be an issue, because there's been a lot of

15   conflicting information from defendant, including they have

16   control over with respect to their search, which gets into

17   another issue with respect to the initial disclosures.  But I

18   think, conceptually, that is fine.  Although, it's -- I'm not

19   sure --

20       THE COURT:  Then that resolves that issue.

21       Next one is identities of any other individuals with

22   reservations who were denied entry into Pergola over the class

23   period.  There's a pretty powerful argument that defendants

24   have made with respect to burden on this that it's

25   disproportionate.

MC7GsmiC

1          Let me hear from plaintiff with respect to that.

2          MS. LIEDERMAN:  Yes, your Honor.  So first of all --

3          THE COURT:  Identify yourself, please, for the record.

4     Is this Ms. Liederman?

5          MS. LIEDERMAN:  Sure.  This is Chloe Liederman for the

6     plaintiff.

7          So first of all, according to the documents already

8     produced, for example, those marked D23 to 26, there is an

9     application called Guest Book that the restaurant utilizes.

10    And this Guest Book records those instances when a reservation

11    was canceled by Pergola, as opposed to by anyone else.  And

12    these documents are maintained in the regular course of

13    business.  They're all electronically stored.  It's not

14    something that defendants have to go hunting around for.  And

15    so we're interested in the identities and contact information

16    of those who made reservations during the class period and then

17    had their reservation canceled by Pergola for some reason.

18    Q.  And explain to me how that's relevant to your case.

19    A.  Well, it goes to the numerosity requirement of the class

20    certification process.  We're trying to get a sense of the size

21    of the class.  And then we would contact those individuals

22    only, just the ones that had their reservation canceled by

23    Pergola and send them notice of the class.

24          And if their facts make them eligible class members,

25    then they could join the class after certification, if

MC7GsmiC

1    certification occurs.

2              THE COURT:  But you are not purporting to represent a

3    class of people who had reservations that were canceled by

4    Pergola, are you?

5              MS. LIEDERMAN:  I believe that is part of the class

6    definition, yes.

7              THE COURT:  So everybody --

8              MS. LIEDERMAN:  It's a subset.

9              THE COURT:  -- who had a reservation by Pergola?

10             MS. LIEDERMAN:  Pardon me.

11             THE COURT:  Everybody who had a reservation canceled

12   by Pergola is a member of the class?

13             MS. LIEDERMAN:  Oh, no, your Honor, those who were

14   canceled by Pergola because of their race.  But in order to

15   find out who those people are, we need access to those people

16   whose reservations were canceled by Pergola for some reason.

17             THE COURT:  So then make the linkage for me between

18   somebody whose reservation is canceled and whether it was

19   canceled by reason of their race, how does one draw that

20   inference?

21             MS. LIEDERMAN:  Well, the latter is a subset of the

22   former.

23             THE COURT:  I understand that.  It may be a big

24   subset, it may be a small subset, it may be a null subset, it

25   may be the whole thing.  Are you going to reach out to

MC7GsmiC

1  everybody who had a reservation canceled by Pergola and survey

2  them as to their race?

3       MS. LIEDERMAN:  To the extent they're willing to

4  communicate to us, then, yes, we would ask them about the facts

5  of their situation.

6       THE COURT:  Let me hear from the defendants.

7       MS. MORALES:  Thank you, your Honor.

8       These numbers are a very high.  Obviously, very

9  invasive.  And it could have prejudicial affect on Pergola's

10 business to have opposing counsel call what appears to be 8,500

11 people who had their reservations canceled.

12      Contrary to what counsel states, Pergola's system does

13 not allow them to differentiate between reservations canceled

14 by the individual and reservations canceled by Pergola.  And of

15 course, there is no reason in our system of why a reservation

16 was canceled.

17      For example, in this specific instance, the documents

18 that were produced to plaintiff regarding the plaintiff did not

19 say that they were turned away from the door for dress code or

20 for any other reason.

21      The volume of documents, of course, we're talking

22 about are extremely high.  And there's just no way to get at

23 what it is that plaintiffs are looking for, which is

24 individuals that had their reservations canceled for a

25 racial -- race discriminatory reason.  And their class is

MC7GsmiC

1    actually defined in their complaint as individuals that had

2    their reservations canceled by Pergola for discriminatory

3    reasons, when white patrons or nonblack patrons were allowed

4    inside.  So that's even further narrowing the scope here, that

5    these individuals and the documents that we're going to be

6    providing to plaintiff, this monster chunk of client

7    information could possibly reasonably yield that information.

8    And it would be an invasive, burdensome process.

9                 MS. LIEDERMAN:  Your Honor, if I may.

10               THE COURT:  Ms. Liederman, I'm going to permit you to

11   respond.

12               Ms. Morales, how do people make reservations at

13   Pergola and how are the cancellations communicated?

14               MS. MORALES:  How are the cancellations communicated

15   to --

16               THE COURT:  How do people make reservations?  Do they

17   come into the location or is it through some other means?

18               MS. MORALES:  The reservations can be made through --

19   a period of time, it was OpenTable, and then they migrated to

20   another application called Resy.  So they could be made via the

21   web, a mobile app or by calling Pergola or, of course, in

22   person.  So those are the ways that somebody could make a

23   reservation.  They could similarly be canceled using any of

24   those four ways.

25               THE COURT:  Ms. Liederman, let me hear from you.

1          MS. LIEDERMAN:  Thank you, your Honor.

2          In point of fact, if one were to look at the document

3    Bates Stamped 24, this is a Guest Book screen image, and it

4    specifically notes that our client, Joshua Smith's reservation

5    was canceled by Pergola towards the bottom of the document.

6          So what we propose is that defendants run a search

7    where basically cancel/at Pergola NYC, because this is how the

8    information is presented on D24.  Now, to the extent that these

9    documents are text searchable -- and we don't know whether or

10   not they are -- but if they're not, then defendants can produce

11   all the Guest Books in the class period to us, and we can

12   perform the arguably onerous task of combing through to see

13   where Pergola has canceled one of those reservations, but we do

14   believe it should be text searchable.

15         THE COURT:  Let me ask Ms. Morales one further

16   question, then.

17         Ms. Morales, what are the reasons why reservations

18   were canceled?  Leave aside the question about race or other

19   reasons other than race that people's reservations are

20   canceled.

21         MS. MORALES:  Yes, Judge.

22         Plaintiff or a customer could change their mind, they

23   could voluntarily cancel their reservation, they could arrive

24   too late for their reservation.  Pergola could cancel their

25   reservation for many reasons unrelated to race, as we put in

MC7GsmiC

```
1    our letter, they come in unruly, they're rude to staff, like I
2    said, they're late, they don't show up.  So there's many, many
3    reasons why any reservation could be canceled at any time.
4              THE COURT:  So I guess my question to you,
5    Ms. Liederman, if reservations are made over the phone and by
6    Resy and by OpenTable -- the Court doesn't have to blind itself
7    to reality -- everybody knows, I don't think that those apps
8    ask people for their race.
9              MS. LIEDERMAN:  Right.
10             THE COURT:  So how is it that you are going to
11   establish -- how is it that the fact that a reservation is
12   canceled going to give rise to any inference that it was
13   canceled because of race, when through all these means, there's
14   no way that Pergola would know the race of the person?
15             MS. LIEDERMAN:  Well, your Honor, for one thing, when
16   the person has showed up for their -- let me back up for a
17   moment.
18             First of all, I just want to be super clear that we're
19   only interested in reservations that were canceled by Pergola,
20   so not reservations canceled by the customer; they changed
21   their plans, they changed their mind, et cetera.  So insofar as
22   people showed up for their reservation, then Pergola would have
23   been aware of their race to the degree that it was visually
24   apparent, right, at the time when they showed up at the
25   restaurant.
```

MC7GsmiC

1          Am I answering your question or have I misunderstood?

2          THE COURT:  You are.

3          Ms. Morales, you are saying that the system doesn't

4     keep track of the reservations by who canceled them?

5          MS. MORALES:  Right.  So the system does not

6     differentiate between canceled by patron versus canceled by

7     Pergola.

8          THE COURT:  So I'm going to deny this request.

9     Ms. Liederman, you might be able to develop evidence at some

10    point that you can renew -- with the information, you can renew

11    the request, if it turns out that Ms. Morales' representations

12    to me are inaccurate.  But you haven't done enough yet to

13    establish that that's the case.

14         MS. ORZICK:  Your Honor, this is a misrepresentation.

15    We have a document that explicitly shows that Pergola does keep

16    track of whether they canceled the reservation or not.  We

17    would ask for an opportunity to submit a copy of that document

18    so your Honor can see it and maybe reconsider the ruling in

19    light of what it says on that document.

20         THE COURT:  You can.  But I'm not going to give you

21    limitless opportunities to litigate this issue.  So you can

22    renew the application, but do it when you think you have the

23    best evidence.  Because, for example, if you give me the

24    document and then it turns out that you have deposition

25    testimony later on the basis of the document, I'm going to be

MC7GsmiC

1    hesitant to have you come back to me again and say, well, now

2    we have even more evidence.  So that's just a word of caution.

3    But you can renew the application.

4            MS. ORZICK:  Yes, your Honor.  Thank you.

5            THE COURT:  The next one is documents and disclosures

6    regarding Pergola's bouncers, security personnel and managers.

7    They say that they produced information in response to the

8    interrogatories, but that our document requests are overbroad.

9            Why don't I hear from plaintiff what it is that you

10   are seeking and why it's relevant.  And then I'll hear from

11   defendants.

12           Ms. Liederman or Ms. Orzick.  Now we're talking about

13   bouncers and security personnel.

14           MS. LIEDERMAN:  Yes, your Honor.  So it's necessary

15   for us to have an understanding of who the bouncers and

16   security and managers are.

17           As we have seen from their document discovery, the way

18   that the restaurant seems to operate is that if there's a

19   question about whether or not someone should be admitted to the

20   restaurant, then the bouncers, the managers and the security

21   personnel appear to be texting one another saying, this person

22   is wearing shorts, can I let them in anyway, for example.

23           And so these are highly relevant.  These are highly

24   relevant witnesses.  We would like to depose these witnesses on

25   what the policies and practices are with respect to letting

MC7GsmiC

1    people into the restaurant, with respect to making exceptions

2    to the dress code, with respect to selectively enforcing the

3    dress code, which is the crux of our claim.  So we think that

4    these are highly relevant individuals.  We think that it's

5    highly relevant to know who worked in these positions during

6    the class period, so over the last four years, so that we can

7    determine who we need to depose in order to ascertain whether

8    or not these policies were in place, whether they were

9    selectively enforced, as we strongly suspected, and the method

10   in which they were enforced.

11        THE COURT:  So as I read the defendant's response,

12   they say that they're going to answer the interrogatory and

13   provide the identity of all persons currently and formerly

14   employed as bouncers, security personnel and managers over the

15   last four years.  If they in fact do do that in response to the

16   interrogatories, does that resolve the issue for the moment?

17        MS. LIEDERMAN:  Yes, it would.

18        THE COURT:  Ms. Morales, I take it you are going to

19   produce the information in response to the interrogatories,

20   including the identities of people currently and formerly

21   employed as bouncers, security personnel or managers for the

22   past four years; is that correct?

23        MS. MORALES:  Yes.  We are providing a list -- we're

24   compiling it now -- of the identities of these individuals.

25        THE COURT:  When are you going to produce that?

MC7GsmiC

1          MS. MORALES:  I should have that by the end of the

2     week, your Honor.

3          THE COURT:  You'll produce that by this coming Monday

4     at the latest.  And that's an order.

5          MS. MORALES:  Yes, your Honor.

6          THE COURT:  I skipped over one, which was

7     communications concerning defendant's dress code policy and

8     selective enforcement.  Defendants produced documents related

9     to the dress code, but apparently not yet communications.  They

10    say they will produce communications between the owners and the

11    security personnel.

12         So let me hear from Ms. Liederman or Ms. Orzick with

13    respect to that.

14         MS. LIEDERMAN:  Yes, your Honor.  For one thing, just

15    between the owners and the security personnel isn't a broad

16    enough scope.  For example, what about the managers.  What

17    about, for example, Jason Cruz, the manager that is featured in

18    the complaint.  So it shouldn't just be between owners and

19    security persons.  We should also include managers.  That's one

20    thing.

21         Another thing is there was an additional document

22    production sent yesterday night that we have reviewed

23    preliminarily and we are continuing to review it.  Now, in

24    those documents, the documents were heavily truncated so that

25    they appear as strips of tiny pieces of conversations going

MC7GsmiC

1    across the page.  And so we do need the complete communication

2    or at least a little bit more context.  And we also need all of

3    those communicants to be identified in the initial disclosures.

4            THE COURT:  Well, with respect to the communicants

5    being identified in the initial disclosures, I would think that

6    the interrogatories that I just ordered to be answered would

7    address that point.

8            Do you disagree, plaintiffs' counsel?

9            MS. LIEDERMAN:  No.  I would assume it does.  Thank

10   you, your Honor.

11           THE COURT:  So then let me ask the defendant, with

12   respect to the scope of the search regarding dress code policy,

13   are you limiting it to communications between the owners and

14   the security personnel or will this pick up communications in

15   which the owners were not copied?

16           MS. ORZICK:  I just wanted to chime in really quick,

17   just with respect to the initial disclosures versus

18   interrogatory responses, the only reason why the interrogatory

19   responses might not be sufficient is if they lacked contact

20   information.  So to the extent that defendant is not in control

21   of these employees or doesn't represent these employees, then

22   we would need their contact information, which generally is in

23   initial disclosures, but not necessarily in interrogatory

24   responses.

25           THE COURT:  I'll address that when we get to initial

MC7GsmiC

1  disclosures.

2          MS. ORZICK:  Yes, your Honor.

3          THE COURT:  I will ask Ms. Morales about the dress

4  code policy.

5          MS. MORALES:  Yes, your Honor.  The documents that

6  were produced were between the owners, from their devices and

7  any of the employees of Pergola.  So that would include

8  security personnel, doormen, managers.  Those are the documents

9  that are relating to the dress code.

10          From what I understand from their letter, plaintiffs

11  are searching for communications regarding whether and when the

12  dress code is enforced.  And so this would be -- and they just

13  referred to communications between security that then talked to

14  the owners about how the dress code should be enforced, for

15  example, and so those are the documents that we think they're

16  looking for, and that's what was produced.

17          It is important to note that this is a restaurant.

18  These are not company-issued phones.  The bouncers either used

19  a radio, two-way radio to communicate with one another or they

20  use their personnel phones that we do not have access to.  So

21  in terms of communication between the owners and everybody

22  else, that's been you produced regarding dress code with the

23  employees.  If they're searching for communications with the

24  manager, we can do that search, we can look for the managers'

25  devices and the managers' conversations with the security

MC7GsmiC

1    personnel.  But in terms of the communications with the

2    security personnel, between them, we don't have control over

3    their phones and I don't -- I don't have their devices to

4    search them.  So what we're providing is how the dress code is

5    actually enforced through the managers and owners.

6            THE COURT:  Ms. Morales, I take it you will also be

7    prepared with respect to the dress code to share your search

8    terms and the time frame; is that correct?  And the custodians?

9            MS. MORALES:  Yes.  Yes, your Honor.

10           THE COURT:  I think that takes care of that.

11           Ms. Orzick and Ms. Liederman, I don't have the power

12   on this call to compel the defendants to search devices over

13   which they have no custody or control; however, I understand

14   that that ties into one of the issues you are going to want me

15   to address, which is the initial disclosures.

16           Is there anything further from plaintiff on this one?

17           MS. LIEDERMAN:  Yes.  Although, you may wish to save

18   it for the initial disclosure discussion, but it's just to say

19   that it's not clear to us who exactly defendants represent.  It

20   was stated to us during the meet-and-confer that all current

21   employees are to be contacted through defense counsel, which

22   certainly suggests that defense counsel represents all current

23   Pergola employees.  And to the extent that they do, then they

24   do have control over their devices.

25           THE COURT:  I'll address that if you have met and

MC7GsmiC

1    conferred about this issue, and if you want to renew your

2    request, but I'm not going to now, on the basis of this record,

3    order the defendants to review documents that they say that

4    they have no control over and that there's no evidence to the

5    contrary.

6          Personnel files of Jason Cruz, they say there's

7    nothing in it that has anything to do with racial

8    discrimination.  It has all of the tax reporting forms and the

9    like.  Why is plaintiff entitled to anything from the personnel

10   file?

11         MS. LIEDERMAN:  For example, defendants mentioned in

12   their letter onboarding documents.  So to the extent that any

13   of those onboarding documents contain references to the

14   antidiscrimination policy -- for example, maybe Mr. Cruz signed

15   such a policy when he was onboarded, we don't know -- any

16   trainings regarding the same.  To the extent that onboarding

17   documents or any part of his personnel file include documents

18   pertaining to discrimination training or policy, then we do

19   think that those should be produced.  Otherwise, we're willing

20   to move on.  If defendants are representing that there no

21   documents in Mr. Cruz's file relating to any discrimination

22   policy or training, then we will take them at their word.

23         THE COURT:  Ms. Morales, you'll produce anything

24   that's in the file that is related to antidiscrimination

25   training and antidiscrimination policy; is that correct?

MC7GsmiC

1              MS. MORALES:  Yes, your Honor.

2              THE COURT:  That takes care of that one.

3              Production of the privilege logs.  The defendants say

4     nothing was withheld on privilege grounds.  Anything for me to

5     address on that one, Ms. Liederman or Ms. Orzick?

6              MS. LIEDERMAN:  No, we were not previously aware of

7     that.  But now that we are.  We are ready to move on.

8              THE COURT:  And pursuant to the ESI protocol, if you

9     reach an agreement on the ESI protocol, that would be fine, but

10    I'm going to leave that to the parties.  I have done what I

11    intended to do.  And I think all that is appropriate at this

12    stage with respect to encouraging the parties to share

13    information about search terms and custodians and the time

14    frame.

15             That brings us to the amendment of the initial

16    disclosures.  What's the issue?

17             MS. LIEDERMAN:  So with regard to initial disclosures,

18    defendants stated in their letter that they listed those

19    individuals with, quote, personal knowledge of Pergola's door

20    policies.  There are a couple of issues with that alone.  First

21    of all, they're actually supposed to -- according to Rule 26 --

22    they're supposed to list any individuals who are likely to have

23    relevant information, not just those with personal knowledge of

24    Pergola's door policies.  Second of all, to the extent that

25    they are listing people with knowledge of Pergola's door

MC7GsmiC

1    policies, this list must be incomplete.  For example, only

2    eight individuals, specific individuals, other than plaintiff

3    were listed.  And furthermore, this individual, Mohan Nod, was

4    not identified nor was this individual Anthony.  And I'm

5    talking right now about the documents at Defendant's 86, 87 and

6    91.  So that's one issue.

7            THE COURT:  Let me ask you, 26(a)(1) requires the

8    disclosing party to list the name and, if known, the address

9    and telephone number of each individual likely to have

10   discoverable information -- and this is the key language --

11   that the disclosing party may use to support the claims and

12   defenses, but the use be solely for impeachment.

13           So you're not entitled to everybody who would have

14   discoverable information, but only those who the disclosing

15   party may use to support its defenses.

16           Do you disagree?

17           MS. LIEDERMAN:  I was not aware of that, but if that

18   is your Honor's decision, I accept it.

19           THE COURT:  Well, I'm just reading the rule.

20           Ms. Morales, what's your poison on the individuals

21   with discoverable information?

22           MS. MORALES:  Judge, we will send the individuals

23   that -- if it came down to a trial -- we would rely upon their

24   knowledge.  We agree with your Honor that the initial

25   disclosures, that Rule 26 does not require us to list every

MC7GsmiC

1    single person in our business that might have knowledge about

2    these certain topics.  It's just the people that we intend to

3    rely on their knowledge, and those individuals were listed on

4    the initial disclosures.

5            THE COURT:  So this objection by the plaintiff is

6    overruled.  That is, Ms. Liederman and Ms. Orzick, the province

7    of interrogatories, to search for people who might have

8    discoverable information and who would not be provided in the

9    initial disclosures.  To Ms. Morales, I am sure you understand

10   the consequence of not listing somebody on the initial

11   disclosures that you would be precluded later on from using

12   that person at trial if, for example, your failure to list that

13   person has resulted in plaintiff not taking that person's

14   testimony.

15           What's next from plaintiff on initial disclosures?

16           MS. LIEDERMAN:  Regarding the categories of

17   information, your Honor, that are required to be listed,

18   entries one and two for the owners, the categories are

19   identified as knowledge about the allegations in the complaint

20   as well as defendant's defenses, which is really a catch-all

21   and we argue not specific enough.

22           THE COURT:  So initial disclosures are intended to be

23   used as a tool in this respect with respect to further

24   discovery.  And I would think that with that disclosure in the

25   initial disclosures, you would have enough to serve the

MC7GsmiC

document request and would serve a document request that would

call for all of the documents in their possession that relate

to the allegations in the complaint and the defendant's

defenses.

Why isn't that enough and why isn't the purpose of

Rule 26(A) being served by that?

MS. LIEDERMAN:  So just to answer your Honor's

question, for example -- so not all owners, right, are very

involved in a restaurant's management.  So we want to make sure

that we have all of the relevant individuals that we need.  So

we are asking about what they have knowledge of, what the

owners have knowledge of because that will help us ascertain

whether information is missing.

Right now, we only have a handful of individuals

listed, one person who has knowledge about the reservation

system, three people who have knowledge on door policies, and

then two people with catch-all.  So for instance, if it turns

out that those two individuals who are owners actually have

very little information with respect to the dress code policy,

if they don't have any information with respect to the dress

code policy, then we will have realized by the initial

disclosures that no one is aware of who created the dress code

policy.  So it's helpful for us so that we can ascertain

without using up all of our 25 interrogatories, who is aware of

what basic information based on the allegations in the

MC7GsmiC

1    complaint and the defenses that they set forth in their answer.

2    THE COURT:  I'm just addressing myself to the

3    26(a)(1)(A)(ii), which is the description by category and

4    location of all documents that the disclosing party has in its

5    possession, custody and control.  And it seems to me from that

6    what the defendant has done is enough.  If you want to serve

7    interrogatories to get at the question of who has knowledge

8    about the dress code and who has knowledge about different

9    categories of information that you are asking about and you

10   need that in order to make sure you are deposing the right

11   people and you really need extra interrogatories, you can come

12   to me for extra interrogatories.  Remember that under the local

13   rules, interrogatories are limited at this stage in terms of

14   what they can ask for.

15   MS. LIEDERMAN:  Yes, your Honor.  And that actually

16   perfectly dovetails to the fact that defendant has not

17   fulfilled its obligation with respect to (A)(1)(ii) for the

18   copy description or category of documents, ESI, intangible

19   things that it has in its possession.  So I'm not sure if your

20   Honor wants to --

21   THE COURT:  I thought that was what I was just

22   addressing with you when you complained with respect to the

23   owners, all the initial disclosure was that they had documents

24   about the allegations in the complaint and defendant's

25   defenses.

MC7GsmiC

1      MS. LIEDERMAN:  Yes.  It's not solely documents with

2  respect to the first issue.  It's with respect to knowledge.

3      For example, it's a very, very strong possibility that

4  there are not a lot of documents at play with respect to the

5  enforcement of the dress code.  So to the extent that they have

6  knowledge of that --

7      THE COURT:  I get it.  I get it now.  I'm sorry for

8  cutting you off.  Your objection is a 26(a)(1)(A)(i) objection

9  that, with respect to the individuals listed in the initial

10  disclosures, all that's said is that they have information

11  about the allegations in the complaint and the defendant's

12  defenses; is that right?

13      MS. LIEDERMAN:  Yes, your Honor.  We have objections

14  based on both.  But you are correct that, with respect to those

15  two owners, our objection is (a)(1)(A)(i).

16      THE COURT:  You are going to take the depositions of

17  the owners; right?

18      MS. LIEDERMAN:  That would be our intention.  We're

19  still trying to ascertain how many people have relevant

20  information.  We'll have to prioritize, given our limited

21  depositions.  Like I said, some owners do very little with

22  respect to day-to-day management, so if they really don't have

23  on-the-ground experience, they might not be the people that we

24  depose and we simply don't know that because they haven't

25  answered the initial disclosures properly.

MC7GsmiC

1          THE COURT:  There are two owners; right?

2          MS. LIEDERMAN:  Yes.

3          THE COURT:  And you have a claim under Title 7; right?

4          MS. LIEDERMAN:  Section 1981, New York State --

5          THE COURT:  Okay.  Isn't it going to be important to

6    you to establish that the owners have knowledge of the

7    discriminatory behavior?  Isn't that going to be something that

8    would be pretty relevant to the case?

9          MS. MORALES:  Yes.  But for instance, if one owner is

10   really ever visiting the restaurant and really involved and the

11   other one is just providing money, for instance, that's the

12   kind of information we're supposed to know when we are trying

13   to ascertain whose devices should be searched, who should be

14   deposed.  If one person is really not involved in the

15   day-to-day operations of the restaurant, then we might use

16   our --

17         THE COURT:  This is not a good one for you, because

18   they're going to be searching the emails of those individuals,

19   you're going to know what's in the emails, and you are going to

20   take the depositions anyway of the two owners.  And if you said

21   to me that they listed everybody out of a long list of people

22   and all they said about that long list of people was that they

23   had information about the allegations in the complaint and the

24   defendant's defenses and it was a bouncer, then that would be

25   more persuasive.  I take it that's not what they have done.

MC7GsmiC

1          MS. LIEDERMAN:  No, it's not, your Honor.

2          THE COURT:  Is there anything else?  I'm not agreeing

3     with you so far on the initial disclosures.

4          Is there anything else on the initial disclosures?

5          MS. LIEDERMAN:  Yes, your Honor.

6          As far as I can tell, the individual with whom

7     plaintiff Smith exchanged Instagram direct messages on

8     January 21st is not identified in the initial disclosures,

9     although defendants have been relying on these communications

10    that -- in which this individual participated.

11         THE COURT:  Ms. Liederman, is that somebody whose name

12    you have got?

13         MS. LIEDERMAN:  I'm not aware of her name, and nor is

14    my client.

15         THE COURT:  Let me ask Ms. Morales that.

16         MS. MORALES:  That individual is listed on plaintiff's

17    initial disclosures, a telephone number.  So they are aware of

18    who she is.  They might not know her legal name, which we

19    provided to them, but they have her contact information and

20    plaintiff Smith --

21         THE COURT:  You'll tell the plaintiff who that person

22    is.  You can do that after this conference.  You can say, so

23    and so is the person with whom your client communicated.

24         MS. MORALES:  Yes, we have.  And we will do so again.

25         THE COURT:  Anything else from plaintiff on the

MC7GsmiC

1   initial disclosures?

2           MS. LIEDERMAN:  No, your Honor.

3           THE COURT:  Anything else to resolve on plaintiffs'

4   side?

5           MS. ORZICK:  Your Honor, just one last thing that we

6   would appreciate your Honor's clarification on.  There seems to

7   be a disconnect between Pergola representing its employees and

8   Pergola having control over its employees' electronic devices.

9   For instance, on the initial disclosures, they did not provide

10  the contact information for the employees identified and said

11  instead, we can communicate to them via defense counsel.  But

12  at the same time said that they cannot examine these

13  individuals' electronic devices.

14          So we either need defense counsel to be examining

15  their electronic devices or we need the opportunity to subpoena

16  them for the relevant documents.  So if you could just provide

17  some clarification as to what the best way to go about doing

18  that is, if either they need to relinquish the contact

19  information or agree for the initial disclosures.

20          THE COURT:  Ms. Morales, do you want to address that

21  issue?

22          MS. MORALES:  Sure, Judge.

23          If plaintiff wants to take the depositions of these

24  individuals, if they want to send subpoenas, then they can send

25  those subpoenas through counsel and we can administer that and

MC7GsmiC

1    get them information and discuss the information with those

2    individuals and produce them to defendants.

3              THE COURT:  But I understand them to be making a

4    somewhat different point, which is that your obligation under

5    26(A)(1) is to provide the telephone number of individuals

6    likely to have discoverable information.  That if you indicate

7    that they can be reached only through you and don't provide any

8    other contact information, then that is tantamount to a

9    statement that you represent those individuals, which would be

10   equivalent to saying that you have control over their

11   documents.

12             Otherwise, if you don't represent those individuals,

13   the plaintiff can reach out to them without having to go

14   through you.  They can reach out to them directly.  So they

15   say, which is it; do you represent them, in which case you have

16   access and control of the devices, or you don't, in which case,

17   we would like the means to contact them without having to go

18   through counsel.

19             Am I understanding, Ms. Orzick, your point correctly?

20             MS. ORZICK:  Yes, your Honor.

21             THE COURT:  Ms. Morales.

22             MS. MORALES:  Well, they can be deposed, of course.

23   And they can answer any questions that plaintiffs may have.  I

24   just want one point of clarification, we did provide contact

25   information for individuals that are no longer employed by

MC7GsmiC

1    Pergola.  The only individuals that we state that can be

2    contacted through counsel are current employees.

3         And just in terms of contact here, there has been a

4    lot of public condemnation of the Pergola staff and the

5    employees.  They have been called racist.  There's a lot of

6    hesitation here of giving their personal addresses and phone

7    numbers to attorneys that are going to call them up and harass

8    them, threaten them, tell them they're racist.  So there is a

9    lot of hesitation here for that information to be produced.

10        THE COURT:  So I'm going to ask you one question, and

11   then I may have some thoughts.  The question, Ms. Morales, is

12   whether or not you represent the current employees.

13        MS. MORALES:  Well, there is case law that says that

14   they are represented by corporate counsel, but we do not have

15   individual retainers with these individuals.

16        THE COURT:  Here is what I am going to need -- I'm not

17   prepared to rule on this.  I understand the issue.

18        From the defendant's side, I'm going to need

19   information from you Ms. Morales, as to whether you represent

20   the current employees or not, with the consequence that if you

21   represent them, plaintiffs counsel can only go through you.

22   And with the possible consequence, I think the likely

23   consequence, that if you represent them, then you probably have

24   custody and control over their materials.  There are some more

25   difficult issues embedded in that that I don't need to address

MC7GsmiC

1    now, but you are free to address that whether the means by

2    which plaintiff can get their electronic discovery.

3              From the plaintiffs side, I'm going to need education

4    as to whether the requirement of the 26(a)(1) can be satisfied

5    by the company saying, get in touch with them through us or

6    whether 26(a)(1) really requires the delivery of home address

7    or something other than the office address and telephone

8    number.

9              You want to put in letters on that issue by one week

10   from today, each of you, three-page letters, single spaced?

11             MS. LIEDERMAN:  Yes, your Honor.

12             THE COURT:  Let's move to defendant's motions.

13             Defendant is asking for communications with potential

14   class members.  The plaintiff is saying there are such

15   communications, but they're being withheld on the grounds of

16   attorney work product, they're not pure solicitation, they

17   contain attorney work product within them.

18             Ms. Morales, what's wrong with what the plaintiff has

19   said?

20             MS. MORALES:  Yes, your Honor.

21             First, as an initial matter, the privilege log that

22   was served by plaintiffs does not describe these communications

23   as attorney work product.  They're described as attorney-client

24   privilege.  The description that plaintiffs have given are

25   communications regarding potential class action claims.

1    They're not described or give any indication that these are

2    individual discrimination claims.  Rather, they're exploring

3    claims, by definition, or other examples of discrimination in

4    the cases that we cited, both solicitations and documents

5    concerning participation in an investigation are not to be

6    privileged documents and that's because they're not individual

7    advice or consulting an attorney.  So that's why there's no

8    request for legal advice.  Based on that, all the

9    communications that are there, we do believe should be

10   produced.

11            THE COURT:  I take it, Ms. Orzick, Ms. Liederman, you

12   have no objection to me reviewing the documents in camera; you

13   prepared to submit them to me for my review?

14            MS. LIEDERMAN:  Yes, your Honor.

15            THE COURT:  Ms. Morales, you have no objection to me

16   reviewing the documents in camera; is that correct?

17            MS. MORALES:  Yes, your Honor.  Because they're all

18   documents sent from potential class members, as they are to

19   attorneys, we also think that those communications are not

20   privileged under either privilege.

21            THE COURT:  How many documents are we talking about

22   that are on the privilege log?

23            MS. MORALES:  There are 40, maybe 45.

24            THE COURT:  Any objections, Ms. Orzick or

25   Ms. Liederman, to providing those?

MC7GsmiC

1          MS. LIEDERMAN:  I'm not understanding the distinction

2     between this question and the last question.

3          THE COURT:  You are going to turn over to me the

4     documents listed on the privilege log; correct?

5          MS. LIEDERMAN:  Yes, your Honor.  Yes.

6          THE COURT:  Good.

7          Documents concerning each occasion that plaintiffs

8     visited Pergola.  The refusal to search for specific dates,

9     including plaintiff Smith's birthday.

10          The plaintiffs say that they produced communications

11     that they recall as well as restaurant confirmations they made.

12     Why wouldn't you -- this is directed to plaintiffs -- if I ask

13     defendants to search by search terms, why wouldn't you take

14     custody of your clients' phone and do a search again with

15     search terms and date ranges and provide the search terms to

16     the other side?

17          MS. ORZICK:  Yes, your Honor.  And we in fact have

18     offered to do that on several occasions.  What defendants have

19     actually asked us to do instead is to review every single

20     communication that they made on those specific dates.  And

21     reviewing text messages and social media messages by date is

22     unduly burdensome.

23          What we can do easily and what I have offered to do on

24     several occasions is to do search term searches, review all of

25     the documents that are yielded by that search and produce the

MC7GsmiC

1    responsive documents.  So we are --

2              THE COURT:  Why is it burdensome to search by date?

3              MS. ORZICK:  Yes, your Honor.  The way that text

4    messages and social media messages are stored on a phone -- and

5    the way that it is extracted is the same way -- essentially,

6    what it has done is it creates a separate file for each

7    communication thread that the individual had with each other

8    person.  So it's not something that can be sorted by date.

9              What would need to happen, if you said produce all of

10   the communications for August 6th of 2021, I would have to open

11   every single text message communication that each plaintiff has

12   ever engaged in, I would have to scroll back manually to

13   August 6th, 2021 for each one -- and this is hundreds of files,

14   hundreds of text message files and hundreds of social media

15   message files -- scroll back to that specific date, review that

16   date and then extract or produce to the extent that there are

17   any messages from that date.  So it's just not possible with

18   respect to text messages and social media messages to, say,

19   just pull all of the August 6th messages, for instance.  I

20   would have to go in and manually see whether there are any

21   messages on that date for every single one of the hundreds of

22   message files.

23             Now, for email, it's very easy to organize by date,

24   and we can do that no problem.

25             It's just extremely burdensome, it would take probably

MC7GsmiC

1    somewhere between 8 and 12 hours just to search this for each

2    date.  Now, we have said before that we're willing to do it on

3    the date of the incident, if it's mutual and they do the same

4    things for the owners.  However, to do this for these three

5    ancillary dates that have arguably very little relevance, I

6    don't think it proportionate to the needs of the case.

7              THE COURT:  Ms. Morales.

8              MS. MORALES:  First of all, what we're talking about

9    is the dates that these individuals went to Pergola and were

10    admitted without incident.  These are heavily relevant to the

11    defenses in the case.

12              In terms of how you can search this information, I

13    find it unlikely that you can't search by date.  If you can

14    just type in as a search term January 21st, 2022 or in a

15    numeral form to be able to search the text messages in that

16    way.  I don't know if you can do that.  I know we can do it on

17    our software, but I'm not sure what they're using.

18              In terms of the individuals that we're talking about

19    here, we're talking about individuals that they spoke to about

20    going to Pergola and who they went to Pergola with about

21    Pergola.  Now, that's not every single person in their phone,

22    of course.  So they don't have to search every single message

23    that they have.  They have to search the messages that Smith, a

24    plaintiff, can have reasonable expectation that they had these

25    conversations with about going to Pergola.

MC7GsmiC

1      For example, one of these is plaintiffs' missed

2  birthday party.  He should be able to remember who attended his

3  birthday or who he was with on those days or who he spoke to

4  about it.  Even so there are descriptions in the complaint

5  about those individuals.

6      For example, plaintiffs' claim here is that they were

7  allowed to go into Pergola because they were with light skinned

8  individuals.  They can identify who those people are.  These

9  are relevant people.  If you have -- for example, if they

10  attended a club with a certain individual, then we should be

11  able to speak to that person, what text messages did you have

12  with plaintiff about that night or what social media do you

13  have, what social media did plaintiff put up on Instagram from

14  that night.  And that can be certainly searchable by date

15  because on Instagram, you can go back in your stories or posts

16  by date and see exactly what it was that was posted on that

17  evening.

18      THE COURT:  Here's what we're going to do.

19      MS. LIEDERMAN:  Please, your Honor.

20      THE COURT:  No, no, no.  The two of you are going to

21  meet-and-confer with respect to this request.  And the

22  defendant is going to tell you exactly what they want to do.

23  You are going to tell them why you think it's burdensome, if

24  you think it's burdensome.  And if you are not able to come to

25  an agreement, in the letters that you are going to submit to me

MC7GsmiC

1    one week from today, the defendant is going to tell me what it

2    wants and why it's reasonable.  And the plaintiff is going to

3    tell me with specificity and with some form of evidence why it

4    is burdensome.  But I'm not going to do a back and forth with

5    respect to this right now.

6          MS. LIEDERMAN:  Your Honor, respectfully, right now,

7    we are actually at that point, everything that Ms. Morales just

8    mentioned is something that plaintiff has already done and has

9    already produced, and I've told her that several times in

10   writing.

11         THE COURT:  Then the meet-and-confer may be very

12   short, and then you will put into me evidence about why it is

13   that you cannot, for example, search social media to identify

14   some dates that seem to be highly relevant.

15         Next one, communications between plaintiffs and other

16   persons regarding the allegations of the complaint or the

17   events of January 21.  Let me ask defense counsel, are you

18   asking for communications between the -- is it just Mr. Smith

19   who is the plaintiff in this case or is there another

20   plaintiff?

21         MS. MORALES:  There's another plaintiff, your Honor.

22         THE COURT:  Are you just asking for communications?

23   What are you asking for and for what time period?

24         MS. MORALES:  We're asking for communications between

25   the plaintiff regarding Pergola -- and that's at any time --

MC7GsmiC

1    and we're asking the plaintiff -- communications between

2    plaintiff and anyone regarding the allegation, so

3    communications between each other regarding the case, regarding

4    the allegations in the complaint.

5            THE COURT:  So with respect to communications between

6    the plaintiffs regarding the allegations after the date that

7    the plaintiffs both retained counsel -- I can get into the

8    joint defense issues, and there's some force to the argument

9    that plaintiff is making -- do you really need those and do you

10   really need me to go into that particular issue?  I don't know,

11   frankly, whether there are any such communications.

12           MS. MORALES:  And I think that that's sort of the

13   threshold matter here, because we asked plaintiff whether or

14   not they were holding back any documents or any communications

15   between plaintiffs, and they said no.  But then in their

16   letter, they raised common interests, so we don't actually

17   know.  They weren't on any privilege log, and so we don't

18   really know what the scope of those communications are or if

19   they exist.

20           THE COURT:  So let me turn now to the plaintiffs.

21           (Pause)

22           THE COURT:  Do I have counsel for plaintiff on?

23           MS. LIEDERMAN:  Yes, your Honor.

24           THE COURT:  Do I have defendant on?

25           MS. MORALES:  Yes.

MC7GsmiC

1        THE COURT:  Are there any communications between the

2   plaintiffs, just between the plaintiffs after the date that

3   they each retained counsel regarding the allegations in the

4   complaint or the events on January 21?

5        MS. LIEDERMAN:  With respect to that, yes.  But it all

6   relates to the litigation.

7        THE COURT:  So there are such communications, you are

8   saying?

9        MS. LIEDERMAN:  Yes, yes.  And just to be clear, I did

10  not represent that there were not.  So there are communications

11  between the two, and then there's also communications between

12  the two of them with us as counsel, so having myself along with

13  both of them.

14        THE COURT:  So you'll be prepared to, then, log those.

15  And you can do that on a categorical basis indicating the

16  nature of the communications.  You can look to the local rules

17  with respect to categorical privilege logs.  That's true for

18  both of you, that categorical privilege logs can be used unless

19  there's any specific reason why it would not be sufficient in

20  this case.

21        With respect to communications that each or both of

22  them may have had with third parties or before they retained

23  you as counsel, are you withholding those documents?

24        MS. LIEDERMAN:  Yes.  So let me take those in turn.

25        First of all, with respect to any communications with

1  third parties, no, we have not withheld those.

2          With respect to their communications prior to

3  retaining counsel, there is a period between the date of the

4  incident and them retaining counsel where they are talking

5  about finding counsel, litigation strategy, those sorts of

6  subjects; those we have withheld.  And I think that they would

7  still be protected by the common interest principles because

8  they are in the process of obtaining counsel for legal

9  representation.

10          THE COURT:  Those you are going to individually log,

11  and you'll turn over a privilege log to the defense with

12  respect to those.  You'll do that by one week from today.

13          Any objection to that?

14          MS. LIEDERMAN:  I would have to double check to see

15  how many there are.  It may be very burdensome to do if it's

16  quite a lot.

17          THE COURT:  If it turns out to be burdensome and you

18  can't do it by December 14th, you'll send me a letter by the

19  end of this week asking for a reasonable extension.

20          MS. LIEDERMAN:  Yes, your Honor.

21          THE COURT:  Last topic that I've got is the documents

22  concerning or reflecting visits to bars, restaurants, lounges,

23  et cetera since January 21, 2022.  One comment with respect to

24  this -- and with respect to some of the language that plaintiff

25  has used -- plaintiffs' letter sort of had aspersions in it

MC7GsmiC

```
1    about what kind of arguments defendants were going to make and

2    that this was racially coded and really arguments that are

3    inappropriate to be made in court.  They were arguments, also,

4    that would suggest that if the Court were to agree with

5    defendants, that the Court would be acting for invidious

6    reasons.  And so I would expect, in the future, that the kind

7    of language that was used is not going to be used in

8    plaintiffs' letter.

9         With that said, let me hear plaintiff.  The allegation

10   is that your clients were reluctant to go to these places and

11   that they experienced emotional distress going to bars,

12   restaurants, lounges after January 21, 2022.  How can you make

13   that allegation and preclude the defendants from the documents

14   that seem to be necessary to inquire into it?

15        MS. LIEDERMAN:  Yes, your Honor.  Two points.

16        First of all, as an initial matter, I want to clarify

17   that the plaintiff does not allege that they ceased entirely

18   going to these venues.

19        THE COURT:  I understand that.

20        MS. LIEDERMAN:  And the second matter is that the

21   request, as phrased, is really quite overbroad in our view.

22   Each and every document and communication about each and every

23   visit to every bar is extremely onerous and burdensome.  That

24   would be anytime someone texted them and invited them out,

25   whether they said yes or no, all of their credit card records.
```

MC7GsmiC

1    It doesn't seem to be limited in any way that's proportionate

2    to the needs of the case.

3         THE COURT:  Let me turn back to defendants.  First of

4    all, I gather there's a request for luxury retail stores.  Is

5    that something that you need?  It seems to me that is

6    particularly outside of the scope of this case.

7         MS. MORALES:  No, we're not asking for receipts to

8    luxury stores or any of their purchases.  The request is

9    limited to bars, restaurants, places that they claim that they

10   don't go to anymore because of their emotional --

11        THE COURT:  What is it that you are asking for?  You

12   are asking for every single document or are you asking for

13   documents sufficient to indicate every restaurant, lounge and

14   bar?  Tell me what you are asking for and why it's relevant and

15   not overbroad.

16        MS. MORALES:  Well, we're asking for social media, so

17   that would be photos and videos of them that they have taken at

18   these places.  And again, this is limited only to after

19   January 21 of this year.  We're asking for text messages or

20   communications with individuals, exactly inviting them out,

21   them agreeing, and them going out, any conversations regarding

22   how they enjoyed their time or didn't enjoy their time.  If

23   there's a communication with a plaintiff and somebody else

24   saying, I was really depressed last night going out because of

25   what happened to me at Pergola, that's obviously relevant.  If

MC7GsmiC

1    one of them goes and spends thousands of dollars at a nightclub

2    on champagne, I think that's also probative as to whether or

3    not their emotional distress is overstated.  So it does go into

4    many different places.  This is the claim, this is their claim

5    for damages.  They're asking for a quarter of a million

6    dollars.  They're saying that they're suffering from mental

7    anguish and they can't go out.

8         THE COURT:  Here is what I am going to do -- the call

9    is running longer than I expected, but it's been productive --

10    on this one, I'm going to ask the parties to include it in

11    their briefs.  I'll expand how much space you have to make it

12    five pages, single spaced.  And the defendant will indicate

13    exactly what it is defendant needs.  You're going to provide

14    the information as to what it is you exactly need to the

15    plaintiffs by the Monday, December 12th, just so that you are

16    both operating off of the same script, from the same page.  And

17    then you'll indicate what it is that you need.  Plaintiffs will

18    indicate why it is burdensome or disproportionate and I will

19    rule on the papers.

20         Is there anything further from defendants on their

21    requests that I haven't either addressed or deferred addressing

22    to the briefing I'm going to get?

23         MS. MORALES:  No, Judge.

24         THE COURT:  Then that leaves the question of an

25    extension of discovery and deposition deadlines.

MC7GsmiC

1            Let me ask, since the request came from defendant,

2    your asking for a 60-day extension of the deadlines; is that

3    correct?

4            MS. MORALES:  Yes, your Honor.

5            THE COURT:  And does plaintiff object to that?

6            MS. LIEDERMAN:  No.  Plaintiffs do not object.

7            THE COURT:  Why don't you also, in the letters that

8    you are going to submit next Wednesday, you'll submit to me a

9    proposed amended case management plan with new dates.  And I'm

10   going to then cancel the January 18, 2023 post discovery

11   conference, and that will be held at a later point in time.

12           If on any of the discovery matters you need the Court

13   to hold a conference, you'll indicate to me in a letter that

14   you need me to hold a conference, and I'll try to schedule it.

15   Otherwise, I'm going to try to rule on the papers with respect

16   to the discovery disputes.

17           Anything else from plaintiff?

18           MS. LIEDERMAN:  No, your Honor.

19           THE COURT:  From defendant, Ms. Morales?

20           MS. MORALES:  I just wanted to flag just one issue, is

21   that plaintiff has mentioned that they intend to file a second

22   amended complaint adding another party.  We've asked the status

23   of that, and we haven't heard back.  I'm just wondering if you

24   can address that issue, because it would affect the dates and

25   going forward.

MC7GsmiC

1          THE COURT:  Ms. Liederman.

2          MS. LIEDERMAN:  Yes.  We did respond to Ms. Morales'

3    email about that.  And the answer that we expressed is that we

4    are still gathering this third plaintiff's facts and we do not

5    yet have a draft to circulate for her review, although we are

6    working on.

7          THE COURT:  I don't know that I can do more.

8          Did my case management plan have a deadline for

9    amended pleadings, Ms. Morales?

10         MS. MORALES:  I can certainly look.  And I would just

11   ask Ms. Liederman if she could just forward that email if they

12   sent it, that would be helpful.

13         I'm pulling up the case management plan now.  And it

14   states that any motion to amend or join additional parties is

15   to be filed by September 9th of 2022.

16         THE COURT:  So, Ms. Liederman, what that means is that

17   when you make your motion, you're going to need to give me the

18   good cause for why you couldn't meet that deadline.  So pay

19   attention to Rule 16 as well as to Rule 15.

20         MS. LIEDERMAN:  Yes, your Honor.

21         THE COURT:  Obviously, the sooner you can do it, the

22   better, both because that will help with you with the good

23   cause and also help in terms of any issues with respect to

24   prejudice.

25         I'm going to ask the two of you to stay on the phone

MC7GsmiC

1    to order a copy of the transcript, the cost to be shared by the

2    parties.  It need not be on an expedited basis, but you may

3    want it on an expedited basis.  And many thanks to the court

4    reporter.  Thank you both.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25